IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

CHRISTINA SMITH, Administrator,
for the Estate of Margaret Stallard, Deceased,

                              Plaintiff,                    Case No. 3:12 CV 1853

         -vs-

                                                      <u>MEMORANDUM   OPINION</u>

ERIE COUNTY SHERIFF'S DEPARTMENT,
et al.,

                            Defendant.

KATZ, J.

        Christina A. Smith, as administratrix of the estate of Margaret Stallard, filed a civil rights action pursuant to 42 U.S.C. §§ 1983 and 1988 against the Erie County Ohio Sheriff's Department, the Erie County Board of Commissioners, the Perkins Township Board of Trustees, and the following individuals:  Terry Lyons,[1] D. Todd Dempsey, Brittany M. Hausman, Sarah R. Worley, Jason A. Beatty, Kyle Bellamy, Linda Scroggy, Ken Klamar, Mark Kusser, and John Doe I, II, and III.  Smith alleged that the defendants violated Stallard's civil rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.  Smith also alleged state law claims of pain and suffering, wrongful death, and willful or wanton misconduct.  (Docket No. 1).

        Stipulated motions to dismiss the complaint against Scroggy, Worley, and Beatty were entered on July 15, 2013, and on October 17, 2013.  (Docket Nos. 32, 58).  The Perkins Township Board of Trustees, Klamar, and Kusser (collectively referred to as the Perkins defendants) moved for summary judgment pursuant to Federal Rule Civil Procedure 56(a) on October 10, 2013.

---

[1] In her complaint, Smith mistakenly spells Terry Lyons's last name as "Lions."  The correct spelling will be used throughout the Court's decision.

(Docket No. 45).  The Erie County Sheriff's Department, the Erie County Board of Commissioners, Lyons, Dempsey, Hausman, and Bellamy (collectively referred to as the Erie defendants) moved for summary judgment on October 17, 2013.  (Docket No. 47).  Smith has filed responses to each motion and the defendants have filed their replies.  (Docket Nos. 61, 62, 64, 67).

Finally, the Perkins defendants have moved to strike the report of Smith's expert, Eric J. Sloan.  (Docket No. 66).  Smith has filed a response.  (Docket No. 68).

## I.  Jurisdiction and Venue

The Court finds that it has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367.  The Court also finds that venue is properly before this Court.  *See* 28 U.S.C. § 1391; N.D. Ohio R. 3.8.

## II.  Summary Judgment

All the defendants have moved for summary judgment.  Summary judgment is proper where "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party asserting a genuine issue of material fact must support the argument either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The Court views the facts in the record and reasonable inferences that can be drawn from those facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  The Court does not weigh the evidence or determines the truth of any matter in dispute.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

2

The party requesting summary judgment bears an initial burden of demonstrating that no genuine issue of material fact exists, which the party must discharge by producing evidence to demonstrate the absence of a genuine issue of material fact or "by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25 (1986) (internal quotation marks omitted).  If the moving party satisfies this burden, the nonmoving party "may not rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren,* 578 F.3d 351, 374 (6th Cir. 2009) (citing Rule 56 and *Matsushita,* 475 U.S. at 586).  The party opposing the summary judgment motion must present sufficient probative evidence supporting its claim that disputes over material facts remain; evidence that is "merely colorable" or "not significantly probative" is insufficient. *Anderson,* 477 U.S. at 248–52.

### III.  Motion to Strike

The Perkins defendants have moved to strike the expert report of Eric J. Sloan asserting that Mr. Sloan is unqualified to render an expert opinion.  Smith opposes the motion, arguing that Sloan is qualified as an expert witness regarding the treatment that Stallard received by the defendants.

Mr. Sloan's report, written July 15, 2013, and filed with this Court on November 13, 2013, is not under oath.  (Docket No. 61-1)  The Sixth Circuit has held that a district court may not consider unsworn, hearsay evidence in deciding whether or not to grant a motion for summary judgment. *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 480–81 (6th Cir. 2008); *Pack v. Damon Corp.*, 434 F.3d 810, 815 (6th Cir. 2006).  Because the report is not under oath, the report is

3

considered hearsay and may not be considered in deciding the current motions for summary judgment. *Sigler*, 532 F.3d at 480–81; *Pack*, 434 F.3d at 815.

The Court notes that in her brief opposing the Perkins defendants' motion for summary judgment, Smith states that Mr. Sloan was camping at the time of the filing of the response and therefore was unable to transmit an affidavit with the report. (Docket No. 61, p. 9 n.1). Smith states that she "seeks leave for the limited purpose of supplementing her brief with Mr. Sloan's affidavit immediately upon receipt." *Id.* However, Smith has failed to file or tender an affidavit from Mr. Sloan regarding his report. Because the affidavit has never been presented to the Court, the report constitutes hearsay evidence that cannot be considered.

The Court further finds that the report is not in compliance with Federal Rule Civil Procedure 26(a)(2)(B)(iv), (v), and (vi). In his report, Mr. Sloan states that his curriculum vitae is attached as Exhibit A. However, the record shows that Exhibit A was never filed with the report. Under Rule 26(a)(2)(B)(iv), the report must state "the witness's qualifications, including a list of all publications authored in the previous 10 years." Although Mr. Sloan's report discusses his prior work experience as a police detective with the Berks County Pennsylvania District Attorney's Office where he processed DUI arrests for two years, the report fails to note if he authored any publications in the previous ten years. The Court assumes that this information would be in Mr. Sloan's missing curriculum vitae.

The report also fails to satisfy Rule 26(a)(2)(B)(v) which requires "a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition." This information is not in the report. The Court would assume that this information would be

4

included in the curriculum vitae. However, the vitae is not before the Court, rendering the report deficient as to this requirement.

Finally, Rule 26(a)(2)(B)(vi) requires "a statement of the compensation to be paid for the study and testimony in the case." Again, this required information is not contained in the report.

In her brief opposing the motion to strike the report (Docket No. 68), Smith argues that Mr. Sloan was qualified as an expert and that the foundational arguments which the defendants raise were cured with the filing of Mr. Sloan's deposition. (Docket No. 66-1). Although Mr. Sloan's deposition does go into greater detail regarding his work experience and experiences as an expert, the deposition does not cure the report's failure to reveal the compensation to be paid for Mr. Sloan's testimony. Because Rule 26(a)(2)(B)(vi) has not been satisfied either in the report or by the deposition, the Court may not consider the report. *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 270–71 (6th Cir. 2010). For these reasons, the motion to strike Mr. Sloan's expert report is granted.

## IV. Facts

The undisputed facts of this unfortunate case are rather simple. On January 1, 2012, the Perkins Township police of Erie County Ohio received a call from a resident on Kevin Drive that a white male was breaking into a pickup truck at 506 Kevin Drive. Kusser was dispatched to the scene. Kusser subsequently found a women, later identified as Margaret Stallard, in the pickup truck. It is undisputed that Stallard was disoriented, relatively incommunicative, and inappropriately dressed for the conditions. Stallard was in her stocking feet and her socks were wet. Stallard had a bag containing mail that identified her name and address. However, Stallard's condition prevented her from providing this information to Kusser.

5

After Kusser determined that Stallard had not stolen any items, she was handcuffed and placed in a police car.  Kusser testified in his deposition that he detected an odor of alcohol on Stallard and believed Stallard was intoxicated because her speech was slurred, her eyes were bloodshot, and her behavior was consistent with an intoxicated individual.  Because of her condition, Kusser transported Stallard to the Erie County Jail.

Kusser testified that Stallard did not request medical assistance.  She did not indicate an intent to commit suicide, nor did she convey a manner which made Kusser feel that he should be concerned for Stallard's medical needs.  Kusser admitted that Stallard was unsteady on her feet.  However, she was able to walk with assistance.

Because the Perkins Township Police Department was constructing a new police station, Kusser drove Stallard to the Erie County Sheriff's Department consistent with Township police policy.  Due to her condition and her inability to care for herself, Stallard was brought to the jail and booked through the Erie County screening process.

When Kusser arrived at the Erie County jail in the early morning of January 1, 2012, he met with Erie County Corrections Officer Hausman.  Hausman immediately met with Stallard to determine whether Stallard was a suicide risk.  Stallard responded to verbal commands during the intake procedure.  Kusser testified in his deposition that he transferred a bag which Stallard had with her to jail personnel.  Kusser testified that he did not perform any type of detailed inventory regarding items Stallard had in her possession at the time of the arrest.  Kusser testified that it was his practice to convey all items of personal property to the jail for inventory during the course of the jail intake process.

6

After Kusser's handcuffs were removed from Stallard and returned to him by Erie County corrections officers, Kusser returned to the police department to make a police report regarding the arrest.  Kusser had no further contact with Stallard.

The Erie County jail's video surveillance system recorded Stallard's intake processing. The video has been properly made a part of the record.  The video shows that Stallard walked unassisted into the jail with her hands restrained behind her back.  Kusser guided her lightly with his hand.  Hausman asked Stallard, "Mam, are you suicidal?"  Stallard responded, "No." Hausman then asked Stallard, "Do you have anything on you?"  Kusser interrupted, stating that he could not "get a lot out of her, you can't understand her, she's highly intoxicated."

Kusser handed Bellamy a bag belonging to Stallard and some paperwork, which Bellamy took to a nearby office.  Bellamy testified in his deposition that he could smell an odor of intoxicants on Stallard and stated that she was "no different than . . . any intoxicated prisoner I've booked in in [sic] my year and [sic] so on this job."  Hausman also stated that she could smell alcohol on Stallard.

The record shows, however, that post-mortem toxicology results did not find alcohol in Stallard's system.  Dr. Robert Forney, the toxicologist who prepared the toxicology report on Stallard, testified in his deposition that this finding cannot be interpreted to mean that Stallard actually had not ingested alcohol in the hours before her death.  Dr. Forney stated that it is not possible to know from toxicological testing whether Stallard had, or had not, ingested alcohol before her death.  The law enforcement officers who interacted with Stallard testified to the smell of alcohol and noted that Stallard's behavior was consistent with alcohol intoxication.

The video shows that Hausman told Stallard to "turn and face the wall."  Stallard complied with the order.  Hausman conducted a pat-down search and removed coins and other items from Stallard's left side pockets.  Stallard remained standing during this procedure.  Hausman told Stallard, "We'll give you a blanket and allow you to lay down for awhile."

Hausman asked Kusser, "Where did you find her?"  Kusser responded, "Over on Kevin Drive . . . .  They thought she was breaking in.  But the door was open and she was just sitting [inaudible]."  Kusser then related Stallard's history of alcohol abuse.  Kusser stated, "I dealt with her a couple months ago.  Over.  That was the same thing.  Pounding on some lady's door trying to get in.  She was drunk then too."

Hausman continued with the pat-down search.  The video shows that although Stallard leaned slightly, she remained upright.  Hausman then called for Bellamy, who returned to the booking area.  Hausman asked, "Want to help me hold her up while she falls asleep."  Of course, Stallard was not sleeping, as the video reflects.  Indeed, she immediately mumbled something to Hausman, and Hausman explained in response, "We're just going to stand you up that way you don't fall over on me."

Bellamy then asked Kusser, "Having fun?"  Kusser responded, "Yeah.  We didn't get no drunks tonight, that's the bad thing."  Hausman interjected, "No drunks?"  Kusser says, "No drunks tonight."  Hausman replies, "What is she?"  Kusser then clarified, "No DUI's, I should say."  Hausman then stated, "I was like . . . if she's not drunk . . . ."  Kusser then said, "She says she's not."  Hausman bent over to pick up some of Stallard's coins that had dropped, so her next statement is inaudible.

As Hausman resumed her pat-down search, Bellamy continued to hold Stallard.  When Hausman moved from Stallard's right side to her left, Stallard turned her head and watched the container with her property being moved.  Bellamy asked Hausman, "Where are you going to put her?"  Hausman responded that Stallard would be placed in Congregant Holding, a temporary housing area in the jail.

Hausman proceeded to pat Stallard's lower legs.  As she did, Hausman asked Stallard to lift her left foot.  Stallard complied with the request.  Stallard then lifted her right foot.  Stallard's legs did not buckle during this procedure.  Hausman removed the handcuffs from Stallard's writs and returned them to Kusser.  Hausman then told Stallard, "I'll help you take your jacket off, okay."  Stallard responded, asking if she could keep the coat.  Hausman told her that they could not let her keep the coat, and that the coat would be placed in a bag for her.  Hausman helped Stallard remove her left arm from the left sleeve.  Bellamy helped Stallard remove her right arm from the right sleeve.  Bellamy then left Stallard's side, holding her coat.

After her coat was removed, Stallard turned and took a few steps toward the interior of the building while adjusting her glasses.  Hausman told Stallard to "hold on, turn around."  Stallard complied with the order.  Stallard asked, "Can I get a pop?"  Hausman repeated, "Hold on, turn around."  Stallard then turned her head toward Bellamy and again asked, "Can I get a pop?"  Hausman said, "What?"  Stallard repeated her request for a pop.  Hausman responded, "Pop?  No you can't get pop.  This is jail.  We don't got pop."

Hausman directed Stallard to face the wall as she patted Stallard's arms.  She asked Stallard to raise her arms, which were placed on the wall.  Stallard did so, and Hausman responded, "There you go."  Bellamy dropped Stallard's coat on the floor.  Hausman then

completed the pat-down of Stallard's shoulders, underarms, and torso.  Hausman told Stallard, "Alright, we're going to walk you over there."  Bellamy assumed a position behind Stallard, but did not touch her.  Hausman placed one hand on Stallard's left arm and another on her back.  The two began walking to the Congregant Holding area.  Stallard observed her coat, now on the floor, and again asked for her coat.  Hausman told Stallard that the coat would be placed in a bag.

Stallard walked quickly and easily out of the view of the video camera.  Hausman testified in her deposition that Stallard's ability to move improved as the intake process proceeded.  Hausman stated:  "At first, when she came in she was unsteady on her feet, but could still stand up, and then later on she seemed like she got better at walking, like she could walk a straight line."

The evidence establishes that no video camera is located in the Congregant Holding area where Stallard was taken.  Hausman testified that when Stallard arrived at the housing area, another female was also there.  A short time later, Stallard attempted to climb on the bunk where the other inmate was sleeping.  Hausman instructed Stallard to go back to her side of the cell and lie down.

Hausman stated that she and Bellamy began completing the various booking documents.  The documents included a Medical Evaluation form.  The form shows that Stallard was conscious and appeared to be under the influence of alcohol or drugs.  Hausman stated that she noted in a comment section on the form that Stallard was highly intoxicated at booking.  Bellamy examined the contents of the bag containing Stallard's belongings.  Hausman was informed that Stallard had been carrying two prescription bottles.  Hausman affirmed in Question 6 of the form that Stallard was carrying medications.

Hausman also wrote on the form the names of the medications identified on the bottles as Alprazolam and Amtriptyline.  Dempsey testified that jail procedures require that when a prisoner brings medications into the facility, the medications are turned over to the medical staff.  Hausman testified that corrections officers place the medications in a bag or envelope, attach the Medical Evaluation form, and place the package in the nurse's medical box.  Bellamy stated that medications are separated from other forms of personal property for security.  Corrections officers are instructed not to count the pills in bottles or analyze the medications because they are not medical professionals.  Because of this policy, Hausman testified that she did not open the bottles or count the pills.

Hausman stated that she did not go to the Congregant Holding Area to question Stallard concerning the medication because she believed Stallard to be intoxicated and because her "experience with intoxicated people is they're going to give you unreliable information and that they just — they're going to go home once they just sleep it off."  Thus, the responsibility for an additional health investigation was delayed until the jail's nurse went on duty at 7:00 a.m.

During the course of completing the medical form, Hausman stated that she asked Bellamy to check on the condition of Stallard.  After another male inmate was brought in for booking, Stallard was observed trying to climb onto the concrete slab where another female inmate was sleeping.  Because Stallard could have awakened the other inmate, Stallard was moved to another temporary housing area called Contact Visitation.

The record shows that the Contact Visitation area is another temporary area, similar to the Congregate Holding area, except that the area was not equipped with a toilet.  It is equipped with an intercom button, which an inmate may use to summon a member of the jail staff.  Officers can

also hear what is occurring in the cell with the door shut.  The door contains a large window.  In addition, a large glass window is located to the exterior right of the door.  The windows allow the interior of the cell to be visible from the hallway.  Audible events inside the cell can be heard from the hallway.

The jail's video surveillance system includes a camera that is directed to the hallway outside the Contact Visitation area where Stallard was placed.  The video shows that corrections officers made numerous visual checks of Stallard after she was placed in Contact Visitation.  The video reflects that at 4:12:52 a.m. Stallard walked unassisted with Hausman into a Contact Visitation cell.  Following her placement in the cell, the video establishes that Stallard was visually observed at the following times:  4:31:09 a.m.; 4:42:44 a.m.; 4:59:52 a.m.; 5:16:24 a.m.; 5:20:05 a.m.; 5:24:35 a.m.; 5:39:01 a.m.; 7:08:51 a.m.; and 7:35:38 a.m.  At 8:14:40 a.m. Worley and Scroggy met and talked in the doorway leading to the Contact Visitation area.  Worley testified that during this conversation she told Scroggy that Stallard was snoring.

Worley testified that shortly after the 8:14:40 conversation, Scroggy went to Worley who was then in the Control Room.  Scroggy commented that one of Stallard's prescription bottles filled the prior day was for a large number of pills that were missing.  Worley and Scroggy went to Stallard's cell to question Stallard concerning the missing medication.

Upon their arrival, Worley noticed that Stallard was no longer snoring, even though she had been loudly snoring approximately fifteen minutes before.  Worley asked for the lights to be activated.  Stallard was found to have urinated in her pants.  Worley and Scroggy called Stallard's name loudly with no response.  Scroggy rolled Stallard on her back.  Stallard's body appeared

limp.  Her lips were lightly blue.  As Worley felt for a pulse, Scroggy tested Stallard's blood oxygen levels.

Emergency medical care was immediately provided.  Upon finding the oxygen level low, Worley immediately called for the EMS.  Worley and Beatty retrieved a defibrillator while Scroggy began performing chest compressions.  The defibrillator was used and Scroggy and Worley continued to administer CPR until Perkins Township EMS personnel arrived.  Stallard was pronounced dead by EMS personnel shortly after their arrival.

## V.  42 U.S.C. § 1983

To state a cause of action pursuant to § 1983, "a plaintiff must allege the deprivation of a right secured by the United States Constitution or a federal statute by a person who was acting under color of state law."  *Barrett v. Steubenville City Sch.*, 388 F.3d 967, 971 (6th Cir. 2004) (internal quotation marks and citation omitted).  Because Smith states in her complaint that the defendants violated Stallard's rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, Smith's use of § 1983 as the mechanism to vindicate Stallard's rights is proper.

## VI.  Eighth Amendment

Smith alleged that Stallard's Eighth Amendment rights were violated.  The Eighth Amendment's cruel and unusual punishment analysis is not applicable in this case because Stallard was not a convicted prisoner at the time of her incarceration and death.  *See Whitley v. Albers*, 475 U.S. 312, 318–22 (1986).  Rather, as the court explained in *Aldini v. Johnson*, 609 F.3d 858, 864–65 (6th Cir. 2010):

> "In addressing [a] . . . claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed . . . ."  *Graham v. Connor,* 490

13

U.S. 386, 394, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). "[T]he two primary sources of constitutional protection against physically abusive governmental conduct" are the Fourth and Eighth Amendments. *Id.* The Fourth Amendment's prohibition against unreasonable seizures of the person applies to excessive-force claims that "arise[ ] in the context of an arrest or investigatory stop of a free citizen," *id.,* while the Eighth Amendment's ban on cruel and unusual punishment applies to excessive-force claims brought by convicted criminals serving their sentences. *See Whitley v. Albers,* 475 U.S. 312, 318–322, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986). When neither the Fourth nor the Eighth Amendment serves to protect citizens, courts have applied the Fourteenth Amendment. *Lanman v. Hinson,* 529 F.3d 673, 680–81 (6th Cir. 2008).

The Supreme Court has deliberately left undecided the question of "whether the Fourth Amendment continues to provide protection against deliberate use of excessive force beyond the point at which arrest ends and pretrial detention begins." *Graham*, 490 U.S. at 395 n.10, 109 S. Ct. 1865. A circuit split has emerged from this legal "twilight zone," *Wilson v. Spain,* 209 F.3d 713, 715 (8th Cir. 2000), with courts choosing between the Fourth Amendment and the Fourteenth Amendment to protect those arrested without a warrant between the time of arrest and arraignment. The standards of liability for these causes of action vary widely, *see Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001) ("A substantially higher hurdle must be surpassed to make a showing of excessive force under the Fourteenth Amendment than under the 'objective reasonableness' test of [the Fourth Amendment] . . . ."), and which amendment applies depends on the status of the plaintiff at the time of the incident, whether free citizen, convicted prisoner, or something in between. *See Gravely v. Madden,* 142 F.3d 345, 348–49 (6th Cir. 1998).

As we noted in *Phelps* [*v. Coy*, 286 F.3d 295 (6th Cir. 2002)], if the plaintiff was a free person at the time of the incident and the use of force occurred in the course of an arrest or other seizure of the plaintiff, the plaintiff's claim is governed by the Fourth Amendment's reasonableness standard. 286 F.3d at 299–300 (citing *Graham,* 490 U.S. at 395, 109 S. Ct. 1865). That standard requires that an officer's use of force be objectively reasonable, balancing the cost to the individual against the government's interests in effecting the seizure, and entails "deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Id.* (citing *Katz,* 533 U.S. at 204–05, 121 S. Ct. 2151). The officer's subjective intentions are irrelevant to the Fourth Amendment inquiry. *Id.* (citing *Graham,* 490 U.S. at 397, 109 S. Ct. 1865).

On the other hand, if a plaintiff is in a situation where his rights are not governed by either the Fourth or the Eighth Amendment, the Due Process Clause of the Fourteenth Amendment protects the individual against physical abuse by officials. *Darrah*, 255 F.3d at 305–06. Specifically, "[i]t is clear . . . that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham,* 490 U.S. at 395 n.10, 109 S. Ct. 1865. According to the Supreme Court, a pre-trial detainee is one who "has had only a

14

'judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest.'" *Bell v. Wolfish,* 441 U.S. 520, 536, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979) (citing *Gerstein v. Pugh,* 420 U.S. 103, 114, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975)).

*See also Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013).

Although Smith alleged an Eighth Amendment claim in her complaint, *Aldini* establishes that Smith does not have a cause of action under the Eighth Amendment. *Aldini* explains that the status of Stallard at the time of her death, whether a free citizen, convicted prisoner, or something in between, determines which constitutional amendment, Fourth, Eighth, or Fourteenth, is applicable. *Id.* at 864–65. In this case, Stallard was not a convicted prisoner at the time of her death. Because Stallard was not a convicted criminal, the Eighth Amendment does not provide Smith a cause of action. *Id.* at 864. Accordingly, summary judgment is granted to the defendants on Smith's Eighth Amendment claim.

## VII. Fifth Amendment Claim

In paragraph two of her complaint, Smith alleges that the defendants violated Stallard's Fifth Amendment rights. However, Smith does not allege in her complaint how the defendants violated Stallard's Fifth Amendment rights. In addition, in her responses to the motions for summary judgment, Smith fails to discuss her Fifth Amendment claim. Smith's reliance upon the Fifth Amendment is misplaced. The Fifth Amendment applies to the federal government and not to state or local governments. *See Scott v. Clay County, Tenn.*, 205 F.3d 867, 873 n.8 (6th Cir. 2000); *see also Myers v. Village of Alger, Ohio*, 102 F. App'x 931, 933 (6th Cir. 2004). Further, the Amendment does not apply to state agencies and private individuals. *Fallbrook Irrigation Dist. v. Bradley*, 164 U.S. 112, 158 (1896); *see also Young v. DHL Airlines, Inc.*, No. 98-6265, 1999 WL 777438, at *1 (6th Cir. Sept. 21, 1999). Given that Smith has failed to explain in detail

15

to the Court her Fifth Amendment claim, under *Fallbrook*, *Myers*, *Scott*, and *Young*, the

defendants are entitled to summary judgment as to this allegation.

## VIII. Fourteenth Amendment Claim

Smith also alleges in paragraph two of her complaint a Fourteenth Amendment violation.

In order to state a Fourteenth Amendment claim, Stallard must have been a pretrial detainee at the

time of her death. *Aldini*, 609 F.3d at 865–67. In explaining how a court must examine a claim

under the Fourth Amendment versus the Fourteenth Amendment, *Burgess* states:

> A plaintiff has a substantially higher hurdle to overcome to make a showing
> of excessive force under the Fourteenth Amendment as opposed to under the
> Fourth Amendment. *Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir.
> 2001). Under the Fourth Amendment, we apply an objective reasonableness test,
> looking to the reasonableness of the force in light of the totality of the
> circumstances confronting the defendants, and not to the underlying intent or
> motivation of the defendants. *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir.
> 2004); *see also Graham*, 490 U.S. at 396–97, 109 S. Ct. 1865. We balance "the
> nature and quality of the intrusion on [a plaintiff's] Fourth Amendment interests
> against the countervailing governmental interests at stake." *Ciminillo v. Streicher*,
> 434 F.3d 461, 466–67 (6th Cir. 2006). In doing so, three factors guide our analysis:
> " '[ (1) ] the severity of the crime at issue, [ (2) ] whether the suspect poses an
> immediate threat to the safety of the officers or others, and [ (3) ] whether he is
> actively resisting arrest or attempting to evade arrest by flight.' " *Martin v. City of
> Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (quoting *Graham*, 490 U.S.
> at 396, 109 S. Ct. 1865). These factors are assessed from the perspective of a
> reasonable officer on the scene making a split-second judgment under tense,
> uncertain, and rapidly evolving circumstances without the advantage of 20/20
> hindsight. *Graham*, 490 U.S. at 396–97, 109 S. Ct. 1865.
>
> In contrast, with a Fourteenth Amendment claim, we consider whether the
> defendant's conduct "shocks the conscience" so as to amount to an arbitrary
> exercise of governmental power. *Darrah*, 255 F.3d at 306 (citing *Cnty. of
> Sacramento v. Lewis*, 523 U.S. 833, 845–46, 851–53, 118 S. Ct. 1708, 140 L. Ed.
> 2d 1043 (1998)). This standard differs depending on the factual circumstances.
> *See id*. Where defendants are "afforded a reasonable opportunity to deliberate . . .
> their actions will be deemed conscience-shocking if they were taken with
> 'deliberate indifference' towards the plaintiff's federally protected rights."
> *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000) (citing *Lewis*, 523 U.S.
> at 851–52, 118 S. Ct. 1708). If, however, the incident was a "rapidly evolving,
> fluid, and dangerous predicament," the plaintiff must show that the defendant acted

> "'maliciously and sadistically for the very purpose of causing harm' rather than 'in a good faith effort to maintain or restore discipline.'" *Id.* (quoting *Lewis*, 523 U.S. at 853, 118 S. Ct. 1708).
>
> Notwithstanding the Due Process Clause's broader applicability, we remain cognizant of the fact that "if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520 U.S. 259, 272 n. 7, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997) (citing *Graham*, 490 U.S. at 394, 109 S. Ct. 1865).

*Burgess*, 735 F.3d at 472–73.

*Burgess* noted that until *Aldini*, the Sixth Circuit had never addressed how far the Fourth Amendment protection extended beyond the individual's transfer of custody from the arresting officer to jail authorities. *Id.* at 474. The court noted that the "Fourth Amendment extends at least through the completion of the booking procedure, which is typically handled by jailers." *Id.* (internal quotation marks and citations omitted). In finally determining where the Fourth Amendment ended and the Fourteenth Amendment began, the Sixth Circuit held that "the dividing line between the Fourth and Fourteenth Amendment zones of protection [is] at the probable-cause hearing for warrantless arrests." *Burgess*, 735 F.3d at 474; *see also Aldini*, 609 F.3d at 867. As *Aldini* and *Burgess* explicitly provide that the Fourteenth Amendment does not apply to Stallard because she was not a pretrial detainee at the time of her death, summary judgment is granted to the defendants on Smith's Fourteenth Amendment claim.

## IX. Fourth Amendment

*Aldini* and *Burgess* require that the proper analysis of Smith's federal claim regarding the death of Stallard must be under the Fourth Amendment. The Fourth Amendment has an objective

17

reasonableness test.  The Court looks at the reasonableness of the defendants' actions in light of the totality of the circumstances that were confronting the defendants, and not to the underlying intent or motivation of the defendants.  *Burgess*, 735 F.3d at 472; *Dunigan*, 390 F.3d at 493; *see also Graham*, 490 U.S. at 396–97.  The Court balances "the nature and quality of the intrusion on [a plaintiff's] Fourth Amendment interests against the countervailing governmental interests at stake." *Ciminillo*, 434 F.3d at 466–67.  The reasonableness of the defendants' actions are assessed from the perspective of a reasonable officer on the scene, rather than with the advantage of 20/20 hindsight.  *Graham*, 490 U.S. at 396–97.

In examining the facts under a Fourth Amendment analysis, Stallard was found outside, disoriented, and improperly dressed.  Kusser knew that Stallard had a history of alcohol abuse from a previous contact with Stallard.  Kusser and other jail personnel, as supported by the video from the jail, indicated that they smelled alcohol on Stallard.  Although Smith asserts that Stallard's toxicology report did not find alcohol in Stallard's system, Dr. Forney testified in his deposition that it was impossible to know whether or not Stallard had, or had not, ingested alcohol hours before her death.  Therefore, at the time of Stallard's arrest and booking, because more than one law enforcement officer contemporaneously smelled alcohol on Stallard, Kusser's conclusion that Stallard was under the influence of alcohol was not unreasonable.  *See id.*

The reasonableness of the conduct by jail employees is further supported by Stallard's actions during the booking process.  Although disoriented, Stallard was able to respond to commands from the jailers.  She was capable of standing during the pat-down without falling or buckling her knees.  She was able to walk, unassisted, to two different holding areas of the Erie

18

County jail. Given these actions, it was reasonable for the jail employees to believe that Stallard was not in any acute distress that would required immediate medical attention.

After her removal to the Contact Visitation cell, video evidence establishes that Stallard was visually observed at the following times: 4:31:09 a.m.; 4:42:44 a.m.; 4:59:52 a.m.; 5:16:24 a.m.; 5:20:05 a.m.; 5:24:35 a.m.; 5:39:01 a.m.; 7:08:51 a.m.; and 7:35:38 a.m. At 8:14:40 a.m. Stallard was heard to be snoring loudly. On each occasion, Stallard was found not to be in distress. These multiple observations within less than a four hour time period establishes that jail personnel were reasonable in their conduct towards Stallard. Although Smith asserts that the toxicology report establishes that jail personnel should have known Stallard had ingested a lethal combination of drugs, the Court must examine the circumstances without the advantage of 20/20 hindsight. *Id.*

This is also true regarding the number of prescription medications in Stallard's possession at the time of her arrest. Smith asserts that had Kusser and jail personnel examined the contents of the prescription bottles in Stallard's possession at the time of her arrest, they would have been aware of the possibility that Stallard could be under the influence of a fatal dose of drugs. However, this argument again requires the Court to engage in 20/20 hindsight. The facts establish that Kusser and jail personnel followed jail procedures by noting that Stallard was in possession of prescription medications and forwarding the unopened containers to the appropriate medical officer.

This procedure is completely reasonable. As the defendants noted in their brief before the Court, law enforcement officials are not medical personnel. They are not trained in identifying drugs. Simply because a medication bottle may identify a particular drug does not necessarily

19

mean that the drug in the container is the drug identified on the label.  That determination would have to be made by trained medical personnel.  The Court's responsibility is to view the totality of the circumstances and examine whether law enforcement personnel acted in a reasonable manner. *Id.*  Because Kusser and jail officials were not trained medical personnel, even if they had counted the pills in the containers, they would not have the medical expertise to determine whether the pills were actually the ones described on the labels of the containers.  Accordingly, the Court cannot conclude that defendants engaged in conduct that violated Stallard's Fourth Amendment rights.

## X.  Municipal Liability

Smith's claims against the Erie County Sheriff's Department, the Erie County Board of Commissioners, and the Perkins Township Board of Trustees also fail.  A plaintiff raising a municipal liability claim under § 1983 must demonstrate that the alleged federal violation occurred because of a municipal policy or custom.  *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978).  "A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following:  (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations."  *Burgess*, 735 F.3d at 478.  A municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents."  *Monell,* 436 U.S. at 694; *Burgess*, 735 F.3d at 478.

Smith argues that the policy manual of Perkins Township, which was approved by its Police Chief Ken Klamar, fails to contain a policy with respect to the identification of individuals

at risk for drug overdoses or who have serious medical needs.  In addition, Klamar admitted that his officers receive no training with respect to identifying a person at risk for a drug overdose.  Because of the lack of instruction, Smith asserts that the Township can be held liable under a failure to properly train theory.

Smith presents this same argument with regard to the Erie County Board of Commissioners and the Erie County Sheriff's Department.  Like Perkins Township, the record establishes that the Erie County jail lacks a policy to identify individuals who are at risk for drug overdoses.  Smith notes that there is no training for jail employees for determining when a prisoner is at risk for drug overdoses and should be transported to the hospital for medical care.

Municipalities face policy-based liability under § 1983 only if a plaintiff demonstrates "that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged."  *Board of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original).  Where, as here, a plaintiff points to a municipal policy of inaction as the municipality's "deliberate conduct," the plaintiff must show that the municipality's failure to act constitutes "deliberate indifference" to the plaintiff's constitutional rights, *see id*. at 407, and "directly caused" the plaintiff's injury.  *See id*. at 415.  "A showing of simple or even heightened negligence will not suffice."  *Id*. at 407.  With limited exceptions, deliberate indifference must be established with evidence that the municipality ignored a pattern of similar constitutional violations.  *See id*. at 407–09.

Under the Supreme Court's decision in *Brown*, Smith's theory of municipal liability fails for two reasons.  First, Smith offered no evidence establishing a pattern of similar constitutional violations and fails to establish that her case falls into an exception to this rule.  *Id*.  Second, the

numerous observations of Stallard by Kusser during the arrest, and the Erie County jail personnel after her incarceration, establishes that Stallard was not ignored and was under constant observation regarding her condition. During each of the observations, no signs indicating a serious medical condition were obvious. The constant monitoring contradicts any claim of deliberate indifference. Thus, no reasonable jury could find that the Perkins Township Board of Trustees, the Erie County Sheriff's Department, and the Erie County Board of Commissioners where deliberately indifferent to Stallard's constitutional rights. *See id.*; *Napier v. Madison County, Ky.*, 238 F.3d 739, 742 (6th Cir. 2001).

## XI. Klamar, Lyons, and Dempsey

Smith argues that Klamar, as the Police Chief of the Perkins Township Police Department; Lyons, as the former sheriff of the Erie County Sheriff's Department; and Dempsey, Erie County Jail Administrator, are also liable for Stallard's death because of their failure to create a policy regarding identifying individuals at risk for drug overdoses. Smith also asserts that these individuals admitted that there is no training for jail employees for determining when a prisoner is at risk for drug overdoses and should be transported to the hospital for medical care.

Regarding Lyons and Dempsey, Dempsey's testimony affirms that there is no written policy regarding identifying a possible drug overdose victim. However, Dempsey's testimony does establish that the county is aware of the problem and that the county provides ongoing education regarding the issue. Thus, even though Erie County may not have a policy regarding the problem, the ongoing training in the area shows that Lyons and Dempsey were not deliberately indifferent to the issue. *Brown*, 520 U.S. at 407, 415.

22

In addition, Stallard has not shown that Klamar, Lyons, and Dempsey, as supervisors, ignored a pattern of similar constitutional violations.  *Id.* at 407–09.  Finally, as supervisors, Klamar, Lyons, and Dempsey may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior.  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  A plaintiff must plead that each government official, through his own actions, violated the Constitution.  *Id.*

The Sixth Circuit, however, has held that a police officer can be liable for the conduct of other police officers when the supervising officer "'either encouraged the specific incident of misconduct or in some other way directly participated in it.'"  *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson Cnty. Ky.*, 668 F.2d 869, 874 (6th Cir. 1982)).  "'At a minimum, a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'"  *Id.* (quoting *Hays*, 668 F.2d at 874).  It is well established that where there has been no constitutional violation by an employee, no liability rests with the supervisor.  *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 470 (6th Cir. 2006); *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) ("If no constitutional violation by the individual defendant is established, the municipal defendants cannot be held liable under § 1983.").

As the Court has previously discussed, the individual defendants that Klamar, Lyons, and Dempsey supervised did not violate Stallard's constitutional rights.  The record establishes that Klamar, Lyons, and Dempsey did not encourage or directly participate in Stallard's incarceration or death.  Further, there is no evidence that these defendants "authorized, approved, or knowingly acquiesced" to the decision to incarcerate Stallard rather than taking her to a hospital for possible treatment.  For these reasons, Klamar, Lyons, and Dempsey are entitled to summary judgment on

Smith's civil rights claims.  *McQueen*, 433 F.3d at 470; *Watkins*, 273 F.3d at 687; *Shehee*, 199 F.3d at 300; *Hays*, 668 F.2d at 874.

## XII.  State Law Claims

Twenty-eight U.S.C. § 1367(c)(3) allows this Court to decline to exercise supplemental jurisdiction over state law claims if this Court "has dismissed all claims over which it has original jurisdiction . . . ."  Because the Court has dismissed Smith federal claims, the Court declines to exercise jurisdiction over Smith's state law claims.  *See* 28 U.S.C. § 1367(c)(3); *see also Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254–55 (6th Cir. 1996).  Accordingly, Smith's state law claims are dismissed without prejudice.

## XIII.  42 U.S.C. § 1988

Smith also filed her complaint pursuant to 42 U.S.C. § 1988.  (Docket No. 1, p. 10).  Smith's requests for attorney's fees and expenses under § 1988 are denied as she is not a prevailing party.  *See Waldo v. Consumers Energy Co.*, 726 F.3d 802, 821 (6th Cir. 2013).

## XIV.  Conclusion

According, the defendants' motions for summary judgment are granted.  Smith's state law claims are dismissed without prejudice.  Smith's motion for attorney's fees under § 1988 is denied.  The motion to strike the expert report of Eric J. Sloan is granted.

IT IS SO ORDERED.

    S/ *David A. Katz*
DAVID A. KATZ
U. S. DISTRICT JUDGE

24